Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
David C. Wright, State Bar No. 177468
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO LLP**
3281 Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Joseph G. Sauder
jgs@mccunewright.com
Matthew D. Schelkopf*
mds@mccunewright.com
Joseph B. Kenney
jbk@mccunewright.com
**MCCUNE WRIGHT AREVALO LLP**
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: (610) 200-0581

*Pro Hac Vice Applications to be Submitted*

*Additional counsel listed below caption*

**Attorneys for Plaintiffs and the Putative Class**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES KINNICK and WALLACE COATS, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>HYUNDAI MOTOR COMPANY, LTD.; HYUNDAI MOTOR AMERICA, INC.; and Does 1 through 10, inclusive,<br><br>        Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violation of the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*);<br>2. Violation of California Unfair Competition Laws (Cal. Bus. & Prof. Code § 17200);<br>3. Violation of California False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et seq.*);<br>4. Violation of Ohio Consumer Sales Practices Act (Ohio Rev. Code § 1345.01, *et seq.*);<br>5. Breach of Express Warranty;<br>6. Breach of Implied Warranty;<br>7. Breach of Written Warranty Under the Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq.*); |

-1-

| | |
|---|---|
| 1 | 10550 Talbert Avenue, Fountain Valley, California 92708 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |

8. Common Law Fraud;
9. Breach of the Duty of Good Faith and Fair Dealing;
10. Violation of the Song-Beverly Act – Breach of Implied Warranty (Cal. Civ. Code §§ 1792, 1791.1, *et seq.*)

**DEMAND FOR JURY TRIAL**

Bonner Walsh
**WALSH PLLC**
21810 Pine Crest Dr.
Bly, Oregon 97622
Telephone: (541) 359-2827
Facsimile: (866) 503-8206
Email:          bonner@walshpllc.com

Adam Gonnelli
**THE SULTZER LAW GROUP, PC**
280 Highway 35, Suite 304
Red Bank, NJ 07701
Telephone: (732) 741-4290
Facsimile: (888) 749-7747
Email:  gonnellia@thesultzerlawgroup.com

-2-

Class Action Complaint
Case No.

## PLAINTIFFS' CLASS ACTION COMPLAINT

Plaintiffs James Kinnick and Wallace Coats bring this action against Defendants Hyundai Motor Company ("HMC"), Hyundai Motor America, Inc. ("HMA"), and Does 1 through 10 (collectively "Defendants"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.        This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners and lessees with Theta 2.0-liter and 2.4-liter gasoline direct injection engines (the "GDI Engines") installed in certain 2015-2016 Hyundai Sonata, Tucson and Santa Fe vehicles (the "Class Vehicles").[1]

2.        This action arises from Defendants' failure to disclose to Plaintiffs and similarly situated consumers, despite their longstanding knowledge, that the engines in the Class Vehicles contain, *inter alia*, a latent defect that results in the restriction of oil flow through the connecting rod bearings, as well as to other vital areas of the engine. This defect – which typically manifests itself during and shortly after the limited warranty period has expired – will cause the Class Vehicles to experience vehicle stalling during operation and catastrophic engine failure.

3.        Significantly, the presence of this defect, resulting in restricted oil flow within the engine, poses a safety risk to the operator and passengers of the Class Vehicles. The failure to have sufficient engine lubrication can cause complete and catastrophic engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speed. This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death. As discussed further herein, numerous owners and lessees of the Class

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models and model years included in the definitions of Class Vehicles after conducting discovery.

Class Action Complaint
Case No.

Vehicles have experienced engine damage and catastrophic failure while operating the Class Vehicles, thus placing themselves and those around them in immediate danger.

4. Not only did Defendants actively conceal the fact that particular components within the Class Vehicles' engines are prone to failure, they did not reveal that the existence of the defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns described herein.

5. Defendants have long been aware of the defect described herein, yet Defendants have routinely refused to repair the Class Vehicles without charge when the defect manifests. Indeed, in many cases Defendants have even refused to disclose the existence of the defect when Class Vehicles displaying symptoms consistent with the defect are brought in for service, instead choosing to ignore the defect until it has caused significant mechanical problems necessitating costly repairs.

6. Many other owners and lessees of the Class Vehicles have communicated with Defendants and/or their agents to request that they remedy and/or address the defect and/or resultant damage at no expense. Defendants have routinely failed to do so even within the warranty period.

7. Defendants have also refused to take any action to correct this concealed defect when it manifests in the Class Vehicles outside of the warranty period. Because the defect can manifest shortly outside of the warranty period for the Class Vehicles – and given Defendants' knowledge of this concealed, safety-related defect – Defendants' attempt to limit the warranty with respect to the engine defect is unconscionable and unenforceable here.

8. Despite notice and knowledge of the defect from the numerous complaints it has received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and their own internal records, including pre-sale durability testing, Defendants have not recalled and/or offered an adequate engine repair to the Class Vehicles, offered their customers suitable repairs or replacements free

-4-

of charge, or offered to reimburse their customers who have incurred out-of-pocket expenses to repair the defect.

9.      As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendants were conducted in a manner giving rise to substantial aggravating circumstances.

10.     Had Plaintiffs and other Class Members known of the defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

11.     Plaintiffs are also informed and believe, and on that basis allege, that as the number of complaints increased, and Class Members grew dissatisfied with the performance of the Class Vehicles, Defendants were forced to acknowledge that the Class Vehicles suffer from an inherent defect.

12.     As a result of the defect and the monetary costs associated with attempting to repair the defect, Plaintiffs and the Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

13.     Accordingly, Plaintiffs bring this action to redress Defendants' violations of the consumer protection statutes of California and Ohio and also seek recovery for Defendants' breach of express warranty, breach of implied warranty, breach of the duty of good faith and fair dealing, and common law fraud.

## **JURISDICTION**

14.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

Class Action Complaint
Case No.

15.     This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the districts of California and throughout the United States.

**VENUE**

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because HMA maintains its corporate headquarters in this district, Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, there are one or more authorized Hyundai dealers within this district and Defendants have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

**PARTIES**

A. **Plaintiff James Kinnick**

17.     Plaintiff Kinnick is a citizen of the State of Ohio, and currently resides in Youngstown, Ohio.

18.     On or about September 30, 2014, Plaintiff leased a new 2015 Hyundai Sonata (VIN: 5NPE24AF5FH019486) from Marhofer Hyundai located in Green, Ohio.

19.     Plaintiff Kinnick leased this vehicle for personal, family and/or household uses.

20.     On or about September 7, 2017, with 32,526 miles on the odometer, Plaintiff's daughter was driving home from work and heard a loud knocking noise emanating from the engine. Plaintiff's daughter stopped at a red light and the car stalled and she restarted the vehicle. A few blocks later, the knocking noise returned and Plaintiff's daughter pulled into a parking lot and called Plaintiff.

21.     Plaintiff arrived and found the car's oil levels to be low.  Plaintiff purchased three quarts of engine oil, which he used to restore the car's oil to the proper level.

-6-

Plaintiff began driving the vehicle and did not feel comfortable driving it, so he pulled into Ron Marhofer Auto Mall, an authorized Hyundai dealership located in Cuyahoga Falls, Ohio. The service manager informed Plaintiff that the engine was "shot" and that there were metal shavings in the oil from the pistons.

22.    After providing the service history on the vehicle, the dealership informed Plaintiff that it would cost $4,000 to $7,000 for a new engine. Hyundai declined to assist Plaintiff by covering all or part of the repair cost.

23.    As a result, on or about September 28, 2017, Plaintiff paid approximately $4,857.72 to have the failed engine in his vehicle replaced with a used engine.

24.    At all times relevant herein, Plaintiff Kinnick adhered to Hyundai's recommended maintenance intervals.

25.    Plaintiff Kinnick has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the engine defect, including, but not limited to, out of pocket losses associated with the engine defect, diminished value of his vehicle, and other consequential damages.

26.    Neither Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff Kinnick of the existence of the defect prior to, or any time after, his purchase.

**B.  Plaintiff Wallace Coats**

27.    Plaintiff Wallace Coats is a citizen of the State of California, and currently resides in Sacramento, California.

28.    On or about May 2016, Plaintiff purchased a pre-owned 2015 Hyundai Sonata (VIN: 5NPE24AF9FH058355) from Paul Blanco's Good Car Company located in Sacramento, California.

29.    Plaintiff Coats purchased (and still owns) this vehicle, which is used for personal, family and/or household uses.

30.    On or about July 17, 2017, while Plaintiff Coats's son was driving northbound on West Street in Woodland, California, the car's engine stopped and would

-7-

not crank or re-start. The car was eventually towed to B&F Body and Machine, an auto repair shop in Woodland, California, where the mechanic indicated that the engine had seized up. His diagnosis was that the vehicle, now with approximately 70,000 miles on the odometer, needed a new engine.

31.     On or about September 6, 2017, Plaintiff contacted Hyundai corporate customer support by phone. Hyundai corporate customer support had his vehicle towed to Sacramento Hyundai, an authorized Hyundai dealership in Sacramento, California. The technician noted that the engine was seized and the crankshaft could not be turned by hand. The technician also found the intake manifold to be contaminated with metal.

32.     As a result, on or about November 1, 2017, Plaintiff paid approximately $7,159.19 to have the failed engine in his vehicle replaced with a remanufactured engine.

33.     At all times relevant herein, Plaintiff Coats adhered to Hyundai's recommended maintenance intervals.

34.     Plaintiff Coats has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the engine defect, including, but not limited to, out of pocket losses associated with the engine defect, diminished value of his vehicle, and other consequential damages.

35.     Neither Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff Coats of the existence of the defect prior to, or any time after, his purchase.

## C. **Defendants**

36.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States.  Furthermore, Defendants design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including the Class Vehicles.

37.     Defendant Hyundai Motor Company, Ltd. ("HMC") is a South Korean corporation.  HMC is the parent corporation of Hyundai Motor America, Inc.  HMC,

-8-

through its various entities, designs, manufactures, markets, distributes and sells Hyundai automobiles in California and multiple other locations in the United States

38.    Defendant Hyundai Motor America, Inc. ("HMA") is incorporated and headquartered in the State of California with its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708.  HMA is HMC's U.S. sales and marketing division, which oversees sales and other operations across the United States. HMA distributes Hyundai vehicles and sells these vehicles through its network of dealers.  Money received from the purchase of a Hyundai vehicle from a dealership flows from the dealer to HMA.

39.    HMA and HMC sell Hyundai vehicles through a network of dealerships that are the agents of HMA and HMC.

40.    There exists, and at all times herein existed, a unity of ownership between HMC, HMA and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

41.    Upon information and belief, Defendant HMC communicates with Defendant HMA concerning virtually all aspects of the Hyundai products it distributes within the United States.

42.    Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the GDI Engines as it relates to the engine defect within the Class Vehicles were performed exclusively by Defendants HMA and HMC.

43.    Upon information and belief, Defendants HMA and HMC developed the post-purchase owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

44.    HMA and HMC are collectively referred to in this complaint as "Hyundai" or "Defendants" unless identified separately.

45.    Hyundai engages in continuous and substantial business in California.

Class Action Complaint
Case No.

46.     The true names and capacities of the defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such defendants by such fictitious names. Each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of the defendants designated herein as DOES when such identities become known.

47.     Based upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## CALIFORNIA LAW APPLIES

48.     It is appropriate to apply California law to the nationwide claims because California's interest in this litigation exceeds that of any other state.

49.     As discussed above, Defendant HMA is located in Fountain Valley, California and is the sole entity in the contiguous 48 U.S. states responsible for distributing, selling, leasing and warranting Hyundai vehicles.

50.     Hyundai's customer relations, engineering, marketing, and warranty departments are all located in HMA's Fountain Valley campus.  Hyundai's customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to Hyundai or third-party websites.  Hyundai's warranty and engineering departments are both responsible for the decisions to conceal the engine defect from Hyundai's customers, and for instituting a policy to systematically deny warranty coverage to those who experienced engine failure caused by the defect.

51.     Based on the foregoing, such policies, practices, acts and omissions giving rise to this Action were developed in, and emanated from, Defendants' headquarters in

-10-

Class Action Complaint
Case No.

Fountain Valley, California.  As detailed below, Hyundai also came to know, or should have come to know, of the engine defect through the activities of Hyundai divisions and affiliated entities located within California.  Accordingly, the State of California has the most significant relationship to this litigation and its law should govern.

## TOLLING OF STATUTES OF LIMITATIONS

52.     Any applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the engine defect until shortly before this class action litigation was commenced.

53.     In addition, even after Plaintiffs and Class Members contacted HMA and/or its authorized dealers for vehicle repairs concerning the engine defect, they were routinely told by Defendant and/or through its dealers that the Class Vehicles were not defective. As described below, the true cause of the premature and catastrophic failure in the Class Vehicles is a defect that results in restricted oil flow.

54.     Defendant HMA was and remains under a continuing duty to disclose to Plaintiffs and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the manufacturing defect will result in restricted oil flow and catastrophic engine failure, that they will require costly repairs, pose safety concerns, and diminish the resale value of the Class Vehicles. As a result of the active concealment by Defendant HMA, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

### A.     The Defective Engine Components within the Class Vehicles

55.     Hyundai is a multinational corporation with over 75,000 employees worldwide.  Hyundai is currently the fourth largest automobile manufacturer in the world.

56.     HMA is the American sales, marketing, and distribution arm of HMC.

57.     According to its website, Hyundai builds the Theta 2.4 liter 4-cylinder Gasoline Direct Injection and Theta 2.0 liter 4-cylinder Turbo engines. As a result,

-11-

1  "[c]astings of engine blocks, heads and crankshafts are delivered from suppliers and

2  machined to HMMA's exact specifications."[2]

3  **B.**   **The GDI Engines**

4       58.    The Theta 2.0 liter and 2.4 liter engines contained in the Class Vehicles

5  contain a gasoline direct-injection ("GDI") fuel delivery system. Hyundai advertises that

6  that "[t]his shorter, more direct path of fuel delivery, allows for greater control of the fuel

7  mixture at the optimum moment, thus improving efficiency. The fuel is injected by a

8  camshaft-driven, high pressure pump that operates at pressures up to 2,175 psi. Direct

9  injection also utilizes a higher than normal 11.3:1 compression ratio for increased power.

10  The pistons are 'dished' to increase combustion efficiency in the cylinder. This

11  powerplant delivers best-in-class fuel economy, best-in-class four-cylinder horsepower

12  and best-in-class torque."

13       59.    As background, the GDI Engines contained in the Class Vehicles use four

14  reciprocating pistons to convert pressure into a rotating motion. Gasoline is mixed with

15  air in the combustion chambers of the engine. To generate such rotating motion, a four-

16  step sequence is used (the "Combustion Cycle"). First, the intake stroke begins with the

17  inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber.

18  Second, the compression stroke begins with the inlet valve closing and the piston

19  beginning its movement upward, compressing the fuel mixture in the combustion

20  chamber. Third, the power stroke begins when the spark plug ignites the fuel mixture,

21  expanding the gases and generating power that is transmitted to the crankshaft. And

22  fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving

23  back up, forcing the exhaust gases out of the cylinder. The exhaust valve then closes, the

24  inlet valve opens, and the Combustion Cycle repeats itself. A diagram of Combustion

25  Cycle is below:

26

27  _____

28  [2] https://www.hyundaiusa.com/about-hyundai/news/Corporate_newengine-
20091120.aspx (last visited August 7, 2017).

Class Action Complaint
Case No.



60.     The pistons are connected to the crankshaft via the connecting rod.  As the connecting rod moves up and down during the Combustion Cycle, this causes the crankshaft to rotate, ultimately resulting in power to the drive wheels of the vehicle. During this cycle, the crankshaft rotates many thousands of times per minute within each connecting rod.  In order to reduce friction and prolong longevity, this design utilizes a bearing placed between the connecting rod and crankshaft surfaces.  The connecting rod bearings allow the crankshaft to rotate within the connecting rods during the Combustion Cycle.  An exemplar diagram of the piston, connecting rod, connecting rod bearing and crankshaft are shown below:



-13-

Class Action Complaint
Case No.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



Figure 3-70.—Connecting rod bearings.

16      61.      When the Class Vehicles are in operation, engine oil is used to lubricate

17 the pistons, cylinder walls, connecting rod bearings and other rotating and moving

18
19
20
21
22
23
24
25
26
27
28



Class Action Complaint
Case No.

components as the pistons move up and down through the four-stroke sequence. Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing, and cool the engine by carrying away heat from the moving parts. Engine oil also cleans and transports contaminants away from the engine to the engine oil filter. Oil is pumped and pressurized throughout the engine by the oil pump. The oil pump draws oil from the oil pan, located underneath the piston and crankshaft. The oil pump forces engine oil through the oil filter and then through passages in the engine to properly lubricate and reduce friction in internal moving engine components. The oil then returns to the oil pan through small drainage holes located throughout the engine where it will be recirculated by the oil pump. Below is a diagram illustrating the typical path and channels of engine oil lubrication in an overhead cam engine:

62.    The connecting rod bearings are also lubricated with engine oil in order to allow the crankshaft to rotate within the connecting rods. A close-up picture of a functional connecting rod bearing is below:



-15-

**C.  Previous GDI Engine Recalls**

63.    In or around September 10, 2015, Hyundai Motor America publicly recalled certain model year 2011-2012 Sonata vehicles manufactured at Hyundai Motor Manufacturing Alabama and equipped with the 2.4 liter and 2.0 liter GDI Engines. (*See* Exhibit 1.)

64.    According to the Hyundai GDI Recall, Hyundai determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during December 11, 2009, to April 12, 2012. As a result, and according to the Hyundai GDI Recall:

> [i]f the debris is not completely removed from the crankshaft's oil passages, it can be forced into the connecting rod oiling passages restricting oil flow to the bearings.  Since bearings are cooled by oil flow between the bearing and journal, a reduction in the flow of oil may raise bearing temperatures increasing the potential of premature bearing wear.  A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the engine which increases in frequency as the engine rpm increases.  A worn connecting rod bearing may also result in illumination of the oil pressure lamp in the instrument cluster. If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion.

65.    Hyundai went on to explain, in Safety Recall Report 15V-568, that it became aware of engine-related warranty claims in the field. Furthermore, "[t]he vast majority of those claims evidenced that customers were responding to substantial noise, or the vehicle's check engine light, and bringing their vehicles to service as a result of those warnings. Many customers also complained after the warranty was no longer available."

66.    As a result, Hyundai decided to issue a safety recall for approximately 470,000 model year 2011-2012 Sonata vehicles manufactured between December 11, 2009 and April 12, 2012 at Hyundai Motor Manufacturing Alabama and equipped with either a 2.0 liter or 2.4 liter Gasoline Direct Injection engine.

Class Action Complaint
Case No.

67.     The recall provided notification to owners of the issue, inspection, and replacement of the engine assembly, as necessary, free of charge. Additionally, Hyundai increased the warranty for the engine sub-assembly (short block) to 10 years/120,000 miles for both original and subsequent owners.

68.     In or around May 25-June 10, 2016, Kia Motors America (an automotive company in which Hyundai owns a 33.88% stake in) followed Hyundai's lead and notified owners of 2011-14 MY Optima vehicles of issues with the same connecting rod wear which results in knocking noise from the same GDI engines. As a result, Kia provided all owners with a warranty extension on the "short block"[3] assembly for a period of 10 years starting from the date of first service or 120,000 miles. Kia also alerted owners that if the vehicles continue to be driven with a worn connecting rod bearing, the bearing can fail and may result in engine failure.

69.     In March and June 2017, Hyundai and Kia announced that they were recalling an additional 1.4 million vehicles with the GDI Engines because they received widespread reports that the engines could fail and stall, *i.e.* the same reason for the first recall. This recall included the 2013-2014 Hyundai Santa Fe, the 2013-2104 Sonata, the 2011-2014 Kia Optima, the 2011-2013 Kia Sportage, and the 2012-2014 Kia Sorento vehicles. (*See* Exhibits 2 and 3.)

70.     The Class Vehicles have not been recalled despite having the same engine and Plaintiffs and Members of the Class notifying Hyundai about their engines stalling and failing while being operated.

**D.     Engine Failures within the Class Vehicles**

71.     Upon information and belief, the connecting rod bearings in the GDI Engines undergo prolonged failure as metal debris circulates throughout the engine via the engine oil. Over time, and as a result of these contaminants in the oiling system, the

---

[3] Per Kia's description, the short block consists of the engine block, crankshaft and bearings, connecting rods and bearings and pistons.

-17-

Class Action Complaint
Case No.

connecting rod bearings begin to fracture. Once the connecting rod bearings fracture, large amounts of metal debris begins to accumulate in the engine oil. As a result, the oil becomes so contaminated with metal debris that the oil filter can no longer remove the plethora of contaminants and maintain the necessary oil pressure within the engine. This contaminated engine oil is recirculated throughout the engine by the oil pump, causing damage to the various engine components and eventually resulting in sudden and unexpected catastrophic engine failure. If the vehicle is being operated on the highway at the time of the engine failure, it will ultimately result in a high-speed stalling event.

72.    Additionally, as the connecting rod bearings continue to fracture, the acceptable tolerances between the bearings, the connecting rod, and the crankshaft rapidly deteriorate. Eventually, the Class Vehicles begin producing a "knocking" sound originating from the engine as a result of the deteriorating bearings. In some instances, the defective connecting rod bearings may eventually cause the piston to break through the engine block as a result of the deterioration.

73.    A photograph of a fractured connecting rod bearing removed from a GDI Engine is included below. As shown in the photograph, the bearing has fractured and worn away to the point of laying flush along the inside of the connecting rod. A large fracture is also plainly visible along the bottom left side of the bearing.



-18-

74.     After the connecting rod bearings fail and metal debris is circulated throughout the engine via the engine oil, damage is caused to other key engine components. As pictured below, the main cap – which fastens the crankshaft to the engine – can also be damaged by the metal debris in the engine oil. After the main cap is damaged, play between the main cap and engine develops, which also leads to catastrophic engine failure.



75.     As a result of the defect, the Class Vehicles suffer from restricted and inadequate engine oil lubrication. As explained above, engines are designed to have oil distributed throughout the engine through lubrication channels. When operating properly, the engine oil is distributed throughout the engine by the oil pump and then flows back to the oil pan where it is redistributed throughout the engine.

76.     In the Class Vehicles, the lubrication channels become clogged and restricted as a result of the defect, even under normal use and proper maintenance. When the lubrication channels clog, engine oil is unable to be pumped throughout the engine (through the oil pump) and is also unable to adequately return to the oil pan, causing a condition known as oil starvation. This results in insufficient lubrication throughout the

-19-

Class Vehicle's engine, which causes premature wear of the engine components and catastrophic engine failure.

77.     The engine defect poses serious safety and security issues for operators and occupants of the Class Vehicles. By way of example, the California Department of Motor Vehicles asserts that stalled engines pose a significant safety risk and, as part of its safety curriculum, instructs how to properly respond to a stalled action in order to avoid further risk of injury.

78.     NHTSA takes a similar view of engine failure during vehicle operation. For instance, according to *Forbes*, in 2011 the NHTSA recalled certain Chrysler and Dodge vehicles due to "engine seizure because of connecting rod bearing failure . . . . Engine seizure could increase the risk of a crash."[4]

79.     Defendants failed to adequately research, design, test, and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and/or reasonably foreseeable manner.

**E.     Defendant's Knowledge of the Engine Defect**

80.     Plaintiffs' experiences are by no means isolated or outlying occurrences. Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same engine defect within the Class Vehicles and complaints from earlier model year Hyundai owners and lessees with the same engines.  Upon information and belief, Defendant HMA, through (1) their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration ("NHTSA"), (4) warranty and post-warranty claims, (5) internal pre-sale durability testing, and (6) other various sources, were well

---

[4]  http://www.forbes.com/sites/altheachang/2011/09/30/engine-problems-prompt-chrysler-recalls/ (last visited August 7, 2017).

Class Action Complaint
Case No.

aware of the engine defect but failed to notify consumers of the nature and extent of the problems with the GDI Engines or provide any adequate remedy.

81.     HMA routinely monitors the internet for complaints similar in substance to those quoted below. HMA's customer relations department routinely monitors the internet for customer complaints, and HMA has retained the services of third-parties to do the same. Further, the customer relations division regularly receives and responds to customer calls concerning, *inter alia*, product defects. Through these sources, HMA was made aware of the engine defect. The complaints also indicate HMA's knowledge of the defect and its potential danger.

82.     HMA is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, HMA likely conducts testing on incoming batches of components, including the GDI Engine, to verify that the parts are free from defects and comply with HMA's specifications. Accordingly, HMA knew or should have known that the engine used in the Class Vehicles is defective and likely to fail prematurely, costing Plaintiffs and Class Members thousands of dollars in expenses.

83.     Moreover, HMA also should have known of the connecting rod bearing defect and insufficient lubrication channels because of the sheer number of reports of engine problems relating to the connecting rod bearings and/or lubrication channels. For instance, HMA's customer relations department, which interacts with Hyundai-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of engine problems relating to the connecting rod bearings and lubrication channels. Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

84.     HMA's warranty department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends

-21-

Class Action Complaint
Case No.

in its vehicles. HMA dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide HMA with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case HMA later determines to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to HMA because HMA will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

85.    HMA knew or should have known about the engine defect because of the high number of replacement parts likely ordered from HMA. All Hyundai service centers are required to order replacement parts, including engines, piston assemblies, and connecting rod bearings directly from HMA. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from HMA. HMA routinely monitor part sales reports, and are responsible for actually shipping parts requested by dealerships and technicians. Thus, HMA has detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The sudden increase in orders for the GDI Engines and engine components used in the Class Vehicles was known to HMA, and should have alerted it to the scope and severity of the engine defect.

86.    In September 2012, HMA issued a technical service bulletin ("TSB") to its authorized dealerships regarding an engine knocking noise. TSBs are documents used by automotive manufacturers to inform dealership technicians about new information, including vehicle problems, new repair procedures, and improved parts. In TSB No. 12-EM-006, HMA acknowledged that the earlier model years of the Class Vehicles with identical engines were defective and experienced a "knocking noise." As a result, HMA directed dealers to blame the engine defect on the use of aftermarket oil filters and instructed the dealers to replace the aftermarket oil filter with a genuine Hyundai oil filter. The TSB also explained that this "repair" is not covered under warranty. HMA has failed to provide any post-sale notification to owners and lessees regarding the use of

-22-

1 only genuine Hyundai oil filters in the Class Vehicles. Instead, HMA attempts to

2 circumvent warranty obligations related to the engine defect by faulting customers for use

3 of an aftermarket oil filter. The defective connecting rod bearings and oil lubrication

4 channels are not, however, caused by the use of an aftermarket engine oil filter. Despite

5 HMA's knowledge of this fact, HMA has not informed Plaintiffs of the true cause of the

6 defective connecting rod bearings and insufficient oil lubrication channels.

7 **F.   Complaints by Other Class Members**

8        87.    Representative examples of complaints on the NHTSA website regarding the

9 Class Vehicles are included below (with emphasis supplied in capitalized bold letters) [5]:

10            *a.    Previous Model Year Hyundai GDI Engine Complaints*

11 Vehicle: 2011 Hyundai Sonata
Date Complaint Filed: 1/21/2015
12 Component(s): ENGINE
Date of Incident: 01/19/2015
13 NHTSA ID Number: 10678152
Manufacturer: Hyundai Motor America
14
SUMMARY:
15 **I WAS DRIVING DOWN THE HIGHWAY, THE ENGINE STARTED
MAKING A KNOCKING NOISE.** NO LESS THAN 30 SECONDS LATER
16 DID THE CAR'S ENGINE MAKE A LARGE BAG NOISE AND I RAN OVER
WHAT FELT LIKE PARTS. I COASTED A WHILE DOWN THE ROAD AND
17 FINALLY PULLED THE CAR OVER TO THE SIDE OF THE ROAD. UPON
OPENING THE HOOD I DISCOVERED OIL ALL OVER THE INTAKE AND
18 EXHAUST MANIFOLDS AS WELL AS THE RADIATOR. I CALLED
HYUNDAI ROADSIDE ASSISTANCE AND HAD THE CAR TOWED TO
19 FAULKNER HYUNDAI IN HARRISBURG PA ON 1/19/14. THEY PROVIDED
A SERVICE LOANER AND SAID THEY WOULD GET BACK TO ME WITH
20 AN UPDATE ON THE CAR. I WAITED UNTIL WEDNESDAY THE 21ST
BEFORE CALLING THEM, ONLY TO FIND OUT THAT THE ENGINE HAD
21 SEIZED AND THEY HAD ALREADY TAKEN PICTURES OF THE DAMAGE
AND SENT THEM TO THE HYUNDAI PEOPLE TO SEEK WARRANTEE
22 COVERAGE. THEY ALSO ASKED ME FOR MAINTENANCE RECORDS ON
THE CAR. I CHANGE THE OIL MYSELF AND ALWAYS PUT IN FULL
23 SYNTHETIC, SO THEY HAD ME SUBMIT RECEIPTS FROM THE AUTO
PARTS STORE PROVING I BOUGHT OIL AND FILTERS OR THE SONATA.
24 I AM NOW AWAITING RESOLUTION FROM HYUNDAI. WILL UPDATE
ONCE I HAVE AN ANSWER FROM HYUNDAI. THIS IS A PRETTY
25 SERIOUS SAFETY CONCERN, **THE ENGINE LET GO AT 60+MPH
WITHOUT WARNING, WHEN IT LET GO IT BLEW OIL ALL OVER
26 THE ENGINE COMPARTMENT AND I'M SURE ON THE ROAD AS**

27 _____

28 [5] The following complaints are reproduced as they appear on the NHTSA website. Any
typographical errors are attributable to the original author of the complaint.

Class Action Complaint
Case No.

**WELL. LUCKY I WAS DRIVING EARLY IN THE MORNING AND THEIR WAS VERY LITTLE TRAFFIC.**

Vehicle: 2011 Hyundai Sonata
Date Complaint Filed: 1/06/2015
Component(s): ENGINE
Date of Incident: 01/06/2015
NHTSA ID Number: 10670454
Manufacturer: Hyundai Motor America

**SUMMARY:**
**I WAS TRAVELING DOWN A HIGHWAY WHEN MY ENGINE STARTED TO MAKE A KNOCKING SOUND.** THE CHECK ENGINE LIGHT CAME ON, AND WITHIN 10 SECONDS MY CAR STOPPED RUNNING. I WAS STILL MOVING WHEN THIS HAPPENED. I WAS FORTUNATE TO BE ABLE TO COAST TO A CLOSE BY SIDE ROAD. I AM GRAVELY CONCERNED THAT THIS COULD HAVE HAPPENED ON THE INTERSTATE AT HIGHER SPEEDS, AND THE POTENTIAL CONSEQUENCES OF SUCH. **I HAD THE CAR TOWED TO A DEALER, AND THEY TELL ME THE ENGINE IS SHOT.** I CONTACTED HYUNDAI CUSTOMER CARE, AND THEIR RESPONSE WAS "WHAT DO YOU WANT ME TO DO ABOUT IT." AFTER MORE RESEARCH, I HAVE FOUND NUMEROUS OTHER INSTANCES OF THIS ENGINE FAILURE. IF THIS IS AN ONGOING PROBLEM, I FEEL HYUNDAI SHOULD DO SOMETHING BEFORE SOMEONE GETS KILLED WHEN THIS HAPPENS. PLEASE NOTE I AM THE SECOND OWNER OF THIS CAR. THE MILEAGE AT JUST OVER 85,000 IS MAINLY HIGHWAY MILES, AND THE CAR IS SERVICED REGULARLY.

Vehicle: 2011 Hyundai Sonata
Date Complaint Filed: 10/26/2014
Component(s): ENGINE
Date of Incident: 10/01/2014
NHTSA ID Number: 10650011
Manufacturer: Hyundai Motor America

**SUMMARY:**
10/1/2014 @ 7:30PM EST - **WHILE DRIVING HOME, WAS AT A RED LIGHT WHEN THE CAR STALLED OUT. THEN A LOUD KNOCKING SOUND HAPPENED. *NO ENGINE LIGHT WAS ON*** IT IS VERY UNSAFE FOR THE ENGINE TO STALL OR JUST RANDOMLY SHUTOFF WHILE IN TRAFFIC. THERE WERE NO SIGNS OR WARNINGS, THE VEHICLE JUST STALLED. VEHICLE WAS NOT SAFE TO OPERATE. I HAD THE VEHICLE TOWED TO NORTHTOWNE HYUNDAI DEALER ON SHERIDAN DRIVE, BUFFALO NY.10/3/2014 @ 2:47PM EST - **NORTHTOWNE HYUNDAI DEALER CALLED ME SAID THAT I NEED TO REPLACE MY ENGINE BECAUSE THE PISTON POPPED.** I SAID WELL, MY CAR IS WELL WITHIN THE WARRANTY, ISN'T THIS COVERED? NORTHTOWNE HYUNDAI DEALER SAID THAT WE CAN'T SUBMIT YOUR WARRANTY CLAIM WITH OUT RECEIPTS OF YOUR MAINTENANCE FROM 5K MILES TO PRESENT. 10/3 - 10/13/2014 - CONTACTED OUR 3 LOCAL PLACES WE LIKE TO SEND OUR VEHICLES TO FOR COPIES OF OUR RECEIPTS. WITH NO PROBLEM WE WERE

Class Action Complaint
Case No.

ABLE TO OBTAIN COPIES OF OUR LAST 7 OIL CHANGES AND GENERAL MAINTENANCE RECEIPTS. 10/14/2014 @ 2:00PM EST - MY HUSBAND GAVE NORTHTOWNE HYUNDAI DEALER OUR RECEIPTS AND HE STATED THAT HE WILL SUBMIT OUR CLAIM TO HYUNDAI. 10/24/2014 @ 8:59AM EST - "REGIONAL" / "CORPORATE" CALLED ME AND STATED "THE DISTRICT MANAGER WHO WOULD HAVE AUTHORIZED THE REPAIR, HAD THE DEALERSHIP PARTIALLY DISASSEMBLE THE ENGINE; TAKE OFF THE COVER FOR INSPECTION, AND THERE'S A CONDITION OF SLUDGE WHICH IS INDICATIVE OF EITHER THE MAINTENANCE INTERVALS NOT BEING FOLLOWED; OIL CHANGE NOT FREQUENTLY ENOUGH OR POSSIBLY THE QUALITY OR GRADE OF THE OIL USED. IN EITHER CASE THESE IS NOT A MANUFACTURE DEFECT, SO HE HAS DENIED WARRANTY COVERAGE." I'VE ALSO ADDED MY COMPLAINT TO THE FOLLOWING:[ HTTP://WWW.CHIMICLES.COM/2011-HYUNDAI-SONATA-ENGINE-FAILURE-CLASS-ACTION-LAWSUIT ] ** **OUR LAST OIL CHANGE WAS 8/2/2014 AT 43K MILES ** WE HAD A CLEAN BILL OF HEALTH, NO ISSUES WERE REPORTED OR MAINTENANCE RECOMMENDED AT THAT TIME**.

---

Vehicle: 2012 Hyundai Sonata
Date Complaint Filed: 1/02/2015
Component(s): ENGINE
Date of Incident: 12/27/2013
NHTSA ID Number: 10669708
Manufacturer: Hyundai Motor America

**SUMMARY:**
**WAS DRIVING 35 MPH MAKING A TURN WHEN I HEARD A KNOCKING NOISE**. WAS SUBTLE AT FIRST. CHECKED OIL AND WAS LOW. ADDED 1 QRT OF OIL. DROVE HOME ABOUT 2 MILES AND KNOCKING BECAME EXTREMELY LOUD. **TOOK IT TO LEN STOLER HYUNDAI DEALERSHIP AND THEY STATED THAT EXHAUST MANIFOLD, DRIVE BELT, PISTONS, AND VALVES NEED TO BE REPLACED**. BASICALLY, $6300.00 WORTH OF WORK. CAR IS UP TO DATE ON ALL MAINTENANCE. NO OTHER ISSUES WITH CAR. WARRANTY DOES NOT COVER ENGINE DAMAGE AND NO HELP WAS GIVEN. I HAVE SEEN MANY OTHER COMPLAINTS ABOUT THE SAME ENGINE ISSUES. HYUNDAI SHOULD REPLACE!

---

Vehicle: 2013 Hyundai Santa Fe
Date Complaint Filed: 08/25/2013
Component(s): ENGINE
Date of Incident: 08/21/2013
Component(s): ENGINE
NHTSA ID Number: 10537110
Manufacturer: Hyundai Motor America

**SUMMARY:**
I WAS AT A LIGHT. AS I LET GO OF THE BRAKE. I HEARD A LOUD CLANKING SOUND AND THE FRONT OF THE CAR SHOOK AND THE CAR IMMEDIATELY DIED. I TRIED TO RESTART. MADE THE SAME SOUND AND DIED. CALLED ROADSIDE AND HAD VEHICLE TOWED

TO DEALERSHIP AFTER AN HOUR AND A HALF BEING STUCK AT A LIGHT/INTERSECTION. **I WAS TOLD THE NEXT DAY THAT MY CAR SUFFERED A "CATASTROPHIC ENGINE FAILURE". NO CODES CAME UP. THEY DROPPED THE PAN AND SAID METAL PIECES FELL OUT!** I WAS LIVID! I'VE ONLY HAD THE CAR LESS THAN A MONTH. ONLY ABOUT 1500 MILES AND THE ENGINE WENT OUT! THANK GOD. I JUST DROPPED THE KIDS OFF TO SCHOOL AND THE ROAD WASN'T SO BUSY AS TO CAUSE AN ACCIDENT. I HAD NO WARNINGS FROM STARTING THE CAR. NO MESSAGES FROM BLUE LINK. SERVICE MANAGER AT DEALERSHIP STATES I WOULD NOT HAVE RECEIVED ANY WARNING. BECAUSE IT HAPPENED QUICK WHICH IS WHY IT IS LABELED AS "CATASTROPHIC FAILURE". WHAT IF THIS HAPPENED WITH MY KIDS IN THE CAR. ON THE FREEWAY. OR TRAVELING? SO A REPLACEMENT ENGINE IS BEING ORDERED FROM SOUTHERN CALIFORNIA. I DON'T TRUST IT. I REPORTED IT TO CORPORATE. WHICH SENT TO REGIONAL OFFICE. AND I AM AWAITING A RESPONSE. I ORIGINALLY REQUESTED A REPLACEMENT VEHICLE BUT AFTER READING THE COMPLAINTS ON NHTSA. I WANT MY MONEY BACK. I DON'T TRUST THIS CAR ANYMORE. I DON'T FEEL SAFE AND I DON'T WANT THE THOUGHT IN THE BACK OF MY MIND THAT THERE COULD BE A CHANCE OF SOMETHING ELSE HAPPENING! MY HUSBAND IS DEPLOYED RIGHT NOW. AND WHAT I DESERVE IS SOME PEACE OF MIND AND NOT PUT MYSELF OR MY CHILDREN AT JEOPARDY OF A POSSIBLE REPEAT ENGINE FAILURE. CRACKED FRONT AXLE. ISSUES WITH ACCELERATION OR WHATEVER ELSE THAT CAN OCCUR THAT I'VE READ ON THIS SITE. THIS IS A DEFINITE SAFETY ISSUE AND SHOULD NOT HAVE TO WAIT FOR MORE COMPLAINTS TO DO SOMETHING ABOUT IT! PLEASE HELP ME RESOLVE THIS WITH GETTING MY MONEY BACK! **A BRAND NEW CAR SHOULD NOT HAVE SUFFERED A CATASTROPHIC ENGINE FAILURE!** *TR

### b. Class Vehicle Complaints

Vehicle: 2015 Hyundai Sonata
Date Complaint Filed: 08/16/2017
Component(s): ENGINE
Date of Incident: 07/29/2017
NHTSA ID Number: 11015695
Manufacturer: Hyundai Motor America

**SUMMARY:**
**MY ENGINE SUDDENLY STALLED WHILE DRIVING DOWN A BUSY HIGHWAY WITH MY FAMILY**. LUCKILY NO ONE WAS HURT THANK THE LORD! WE WERE DRIVING DOWN THE HIGHWAY WHEN WE STARTED TO HEAR A KNOCKING NOISE AND THE CAR STARTED TO DECELERATE. WE NOTICED THERE WAS WHITE SMOKE AS WELL. I WAS ABLE TO GET THE CAR TO THE SHOULDER OF THE HIGHWAY. THE CAR WOULD NOT RESTART SO WE CALLED ROADSIDE ASSISTANCE AND SINCE IT WAS SATURDAY EVENING. (AFTER HOURS) WE HAD PARK THE CAR AT A NEARBY WALMART UNTIL MONDAY. I HAD TO DO THE WHOLE ROADSIDE ASSISTANCE SONG AND DANCE ALL OVER AGAIN MONDAY. THE SERVICE DEPARTMENT WAS VERY ACCOMMODATING. THEY WERE PLEASANT AND EVEN PROVIDED A LOANER CAR. THEY INFORMED ME THE ENGINE WOULD NEED TO BE REPLACED BUT SINCE MY CAR ONLY HAD

-26-

34.000 MILES IT SHOULD BE COVERED. THEY SAID THEY JUST HAD TO GET IT APPROVED BY HYUNDAI FIRST. **AFTER A WEEK OF WAITING THEY CALLED ME UP AN TOLD ME HYUNDAI WOULD NOT BE COVERING THE VEHICLE DUE LACK OF MAINTENANCE (SIGHTED OIL CRUDE BUILD UP AS EVIDENCE) AND I WOULD NEED TO FORK OVER $5500.** I GOT THE OIL CHANGED AND MAINTAINED THE CAR BUT FAILED TO KEEP DOCUMENTATION. UPON RESEARCHING THE ISSUE. IT APPEARS HYUNDAI HAS A HISTORY OF NOT STANDING BY THEIR WARRANTY AND LEAVING THEIR CUSTOMERS HIGH AND DRY. IN FACT THEY JUST SETTLED A LAW SUIT FOR THE SAME EXACT THING. SO WE PAID UP. WAITED A WEEK FOR THE REPAIRS AND NOW I'M BACK UP HERE A WEEK LATER WITH ANOTHER ENGINE PROBLEM (OVERHEATING). LUCKILY WE ONLY HAD THE CAR FOR A WEEK BECAUSE THEY LIKELY WOULD'VE CHARGED ME AGAIN. WELL HOPEFULLY THEY WILL PROVIDE ME WITH A LOANER AGAIN BECAUSE THIS JUST DESTROYED MY WORK SCHEDULE FOR TODAY.

Vehicle: 2015 Hyundai Sonata
Date Complaint Filed: 07/06/2017
Component(s): ENGINE
Date of Incident: 7/02/2017
NHTSA ID Number: 11003408
Manufacturer: Hyundai Motor America

**SUMMARY:**
THE CONTACT OWNS A 2015 HYUNDAI SONATA. **THE CONTACT STATED THAT WHILE DRIVING. HE HEARD A RATTLING NOISE UNDER THE HOOD. THE CONTACT STATED ALSO MENTIONED WHILE TAKING THE VEHICLE TO BE SERVICED FOR AN OIL CHANGE. THE RATTLING NOISE BEGAN TO MAKE A LOUD KNOCKING NOISE.** THE CHECK ENGINE WARNING LIGHT ILLUMINATED. THE CONTACT MENTIONED THAT THE INDEPENDENT MECHANIC INFORMED HIM THAT HE SHOULD NOT DRIVE THE VEHICLE AND THAT HE NEEDED TO HAVE THE ENGINE CHECKED. THE VEHICLE WAS THEN TAKEN TO DAVE HALLMAN HYUNDAI AT 2104 STATE ST. ERIE. PA 16503. (814) 452-6731 **WHERE IT WAS DIAGNOSED THAT THERE WAS AN OIL SLUDGE BUILD-UP AND THAT THE ENGINE NEEDED TO BE REPLACED.** THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE BUT DID NOT OFFER ANY FURTHER ASSISTANCE. THE FAILURE MILEAGE WAS 56.150.

Vehicle: 2015 Hyundai Sonata
Date Complaint Filed: 01/24/2017
Component(s): ENGINE
Date of Incident: 01/21/2017
NHTSA ID Number: 10947369
Manufacturer: Hyundai Motor America

**SUMMARY:**
THE CONTACT OWNS A 2016 HYUNDAI SONATA. WHILE DRIVING APPROXIMATELY 35 MPH, THE ENGINE SEIZED WITHOUT WARNING.

-27-

THE VEHICLE WAS TOWED TO A TOW FACILITY. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE VIN AND FAILURE MILEAGE WERE UNKNOWN. UPDATED 05/30/17*LJ

Vehicle: 2015 Hyundai Sonata
Date Complaint Filed: 12/05/2016
Component(s): ENGINE
Date of Incident: 12/03/2016
NHTSA ID Number: 10929989
Manufacturer: Hyundai Motor America

**SUMMARY:**
**WHILE STATIONARY I NOTICED THE CAR'S ENGINE SOUNDED LIKE IT WAS TICKING.** I DROVE OFF ABOUT 35 MILES PER HOUR WHEN MY 2015 HYUNDAI SONATA LIMITED STALLED WHILE DRIVING. THE CAR STARTED SHAKING WHILE ATTEMPTING TO SPEED UP TO KEEP THE VEHICLE RUNNING. I HAD MY PASSENGER WHO WITNESSED THE INCIDENT AND WE RECORDED USING THE CELL PHONE TO RECORD THE INCIDENT. THE ENGINE LIGHT CAME ON THEN OFF AGAIN. EVENTUALLY IT CUT OFF COMPLETELY. I HAD TO RESTART AND THE SPEED OF THE VEHICLE WOULD NOT GO PAST 50 MPH. THE ENGINE SHOOK THE ENTIRE CAR AND SOUNDED LIKE THE GEARS DID NOT WANT TO SHIFT. THE DEALER WAS NOT ABLE TO REPLICATE THE ISSUE OR FIND ANY CODES ON THEIR SYSTEM. THIS SAME THING HAPPEN TO MY 2011 SONATA IN WHICH HYUNDAI REFUSE TO PAY IN A CLASS ACTION LAWSUIT BECAUSE I TRADED OUT OF THE VEHICLE A YEAR AFTER THEY REPLACED THE ENGINE. **THE ENGINE ALSO STALLED WHILE TRAVELING AT HIGHWAY SPEED AND STARTED SMELLING LIKE AN ELECTRICAL FIRE WHILE SMOKE CAME FROM UNDER THE ENGINE.** I HAD TO HAVE IT TOWED BACK TO THE DEALERSHIP. *TR

Vehicle: 2015 Hyundai Sonata
Date Complaint Filed: 11/23/2016
Component(s): ENGINE
Date of Incident: 11/10/2016
NHTSA ID Number: 10927713
Manufacturer: Hyundai Motor America

**SUMMARY:**
MY WIFE HELEN DRIVES TO WORK 35 MILES EACH WAY DAILY, **SHE STARTED HEARING A RATTLING NOISE THAT CAME FROM THE ENGINE AREA.** THE NOISE PERSISTED FOR A FEW DAYS AND WAS OBSERVED DURING HER COMMUTE TO WORK TWICE. HUSBAND TEST DROVE CAR AS WELL AND COMFIRMED A RATTLING NOISE. CAR TOWED TO PREMIER HYNDAUI 3480 NAGLEE ROAD, TRACY , CALIFORNIA,95304. SEVICE TECHNITIAN COMFIRMED IN WRITING VEHICLE HAS A NON REPAIRABLE ENGINE, **METAL EXTRACTS WERE FOUND INSIDE THE OIL PAN AND THE DEALERSHIP ADVISED ENGINE IS NO GOOD AND NEEDS TO BE REPLACED.**

Class Action Complaint
Case No.

Vehicle: 2015 Hyundai Sonata
Date Complaint Filed: 08/24/2016
Component(s): ENGINE
Date of Incident: 08/05/2016
NHTSA ID Number: 10898269
Manufacturer: Hyundai Motor America

**SUMMARY:**
HIGH SPEED ENGINE STALL: WHILE DRIVING AT HIGHWAY SPEEDS
ON AUGUST 5, 2016, MY VEHICLE SUDDENLY LOST POWER WHILE
DRIVING ON THE HIGHWAY, WHICH RESULTED IN VEHICLE COMING
TO A STOP. ON ATTEMPTING TO RESTART THE ENGINE, THE ENGINE
HAD SEIZED AND WOULD NOT RESTART AND THE RESTART ATTEMPT
WAS ACCOMPANIED BY NOISE FROM THE ENGINE AND VIBRATIONS
CAUSING THE ENTIRE VEHICLE TO SHAKE. VEHICLE HAD TO BE
TOWED TO THE DEALER FOR REPAIRS

Vehicle: 2015 Hyundai Sonata
Date Complaint Filed: 03/18/2016
Component(s): ENGINE
Date of Incident: 03/17/2016
NHTSA ID Number: 10850477
Manufacturer: Hyundai Motor America

**SUMMARY:**
THE CONTACT OWNS A 2015 HYUNDAI SONATA. WHILE EXITING THE
VEHICLE AT 40 MPH, THE VEHICLE STALLED WITHOUT WARNING.
THE VEHICLE WAS ABLE TO BE PULLED OVER TO THE SIDE OF THE
ROAD, BUT COULD NOT BE RESTARTED. THE VEHICLE WAS TOWED
TO A DEALER WHERE IT WAS DIAGNOSED THAT THE ENGINE SEIZED
AND NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED.
THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE
FAILURE MILEAGE WAS APPROXIMATELY 4,000.

Vehicle: 2015 Hyundai Sonata
Date Complaint Filed: 02/02/2016
Component(s): ENGINE
Date of Incident: 01/31/2016
NHTSA ID Number: 10823709
Manufacturer: Hyundai Motor America

**SUMMARY:**
I PURCHASED A NEW 2015 HYUNDAI SONATA 8 MOS AGO AND TWO
DAYS AGO WHILE DRIVING ON A LOCAL HIGHWAY I HEARD A LOUD
KNOCKING SOUND WHILE ACCELERATING. YESTERDAY I TOOK IT TO
THE HYUNDAI DEALER SERVICE CTR WHERE I PURCHASED THE
VEHICLE AND I WAS TOLD THAT I NEED A NEW ENGINE DUE TO
THERE BEING METAL SHAVINGS IN THE MOTOR.

88.     Upon information and belief, HMA regularly monitors these NHSTA

databases as part of its ongoing obligation to identify potential defects in its vehicles.

-29-

NHTSA complaints establish that HMA knew, or should have known, of the engine defect *at least* as early as August 25, 2013,[6] before the Class Vehicles at issue in this litigation were sold. Upon information and belief, Defendant became aware of the engine defect earlier than August 25, 2013 through: (1) Defendant's own records of customers' complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) pre-sale durability testing and part sales, and (6) other various sources.

**G.   Pre-Sale Durability Testing**

89.   Defendants are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, Defendants conduct tests, including pre-sale durability testing, on incoming components, including the engine, to verify the parts are free from defects and align with Defendants' specifications. Hyundai represents that it conducts a **"brutal amount of testing"** on its vehicles, including **"everything from pushing the engine in triple-digit heat and subzero arctic conditions to crashing over 100 cars to ensure every measure of safety before production of the car even begins."**[7]

90.   Hyundai acknowledges that it is a "latecomer in the global automotive industry" but that, in response to that, "Hyundai motor has been proving itself through the **most stringent and toughest tests in the development process**."[8] Among these tests is the "WOW (Worst of Worst) test" which has been nicknamed the "door to hell" because the test is held in extreme areas including the rough roads, hilly sections and moist areas in China, extremely hot areas in the Middle East, extreme cold areas in Russia and highways, mountainous areas and slanted hills in Germany. This is where Hyundai Motor's confidence in its powertrain's high performance and strong durability lies."

---

[6]  *See* NHTSA ID Number 10537110.

[7] https://www.hyundaiusa.com/new-thinking/quality.aspx (last visited Dec. 4, 2017).
[8] http://brand.hyundai.com/en/brand/technology/powertrain.do (last visited Dec. 4, 2017).

Class Action Complaint
Case No.

91.     As a result, Hyundai was well aware of the engine defect prior to the Class Vehicles being sold to Class Members.

**H.     Defendants' Warranty-Related Practices**

92.     HMA issued two relevant warranties with each Class Vehicle: a "New Vehicle Limited Warranty," and a "Powertrain Warranty."

93.     Under the basic New Vehicle Limited Warranty, HMA agreed to repair defects reported within the earlier of 5 years or 60,000 miles.

94.     Under the Powertrain Warranty, HMA agreed to repair defects affecting various powertrain components through 10 years and 100,000 miles. According to the Warranty and Consumer Information Manual, Powertrain Coverage Components include:

> **ENGINE**
> Cylinder block/head and all internal parts, manifolds, timing gears, timing chain, timing cover, gaskets and seals, oil pump, water pump, fly-wheel, oil pan assembly, rocker cover and engine mounts, and turbocharger.
>
> **TRANSMISSION/TRANSAXLE**
> Case and all internal parts, axle shafts (front/rear), constant velocity joints, front/rear hub bearings, propeller shafts, seals and gaskets, torque converter and converter housing and clutch cover and housing, transfer case for Santa Fe, Tucson and Veracruz . . . .

95.     HMA instructs vehicle owners and lessees to bring their vehicles to a Hyundai dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to Hyundai dealerships with complaints related to the engine defect.

96.     HMA has evaded its warranty obligations by failing to tell consumers that their vehicles are defective and by representing that the cause of the defect is the owner's neglect to properly maintain the engine oil and/or engine oil level. This representation, however, is false as the engine is inherently defective and will inevitably fail.

97.     In addition, Hyundai has also evaded its warranty obligations by requiring consumers to produce the entire maintenance history of the Class Vehicles, including a mandate that all oil changes be completed at a Hyundai dealership, before determining whether to make the necessary repairs under warranty.  Hyundai, however, knows that

-31-

Class Action Complaint
Case No.

the defect in the Class Vehicles' engines manifests even if the owner or lessee has followed Hyundai's oil change guidelines.  Even if consumers produce their vehicles' maintenance history, Hyundai blames the defect and engine failure on the consumer, refuses to cover the necessary repairs under warranty, and charges as much as $10,000 to repair the engine.

98.    Hyundai also advertises that it offers "America's Best Warranty."  With respect to the powertrain warranty, however, Hyundai publicizes the existence of 10 year/100,000 mile powertrain warranty but fails to mention that subsequent owners only receive powertrain warranty coverage for 5 years/60,000 miles.  As such, subsequent owners are left to discover the limited warranty coverage after purchasing their vehicle. Hyundai's failure to cover repairs under the powertrain warranty between 5 years/60,000 miles and 10 years/100,000 miles is therefore unconscionable and unenforceable.  A typical Hyundai advertisement touting "America's Best Warranty" is pictured below:



99.    In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the defect, despite such defect having been contained in the Class Vehicles when manufactured by Defendant, repair and replacement of the GDI Engine and the unnecessary and premature replacement of the connecting rods, crank shaft, oil pump, and other engine components.

Class Action Complaint
Case No.

100.   Furthermore, a number of Class Members, who presented their Class Vehicles to Hyundai dealerships because of issues related to the defective connecting rod bearings and insufficient engine oil lubrication channels, were denied warranty repairs and, instead, informed that nothing was wrong with their vehicles. As a result, after expiration of the warranty period, Class Members are forced to pay costly repairs to correct the defect.

## CLASS ALLEGATIONS

101.   Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3).

### Nationwide Class:

All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle.

102.   In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the Court declines to certify the Nationwide Class above.  Specifically, the state classes consist of the following:

### California Class:

All persons or entities in California who are current or former owners and/or lessees of a Class Vehicle for primarily personal, family or household purposes, as defined by California Civil Code § 1791(a).

### Ohio Class:

All persons or entities in Ohio who are current or former owners and/or lessees of a Class Vehicle.

103.   Together, the California Class, the Ohio Class, and the Nationwide Class shall be collectively referred to herein as the "Class." Excluded from the Class are HMA, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definitions based on discovery and further investigation.

-33-

104.   <u>Numerosity</u>:  Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and leased in each of the states that are the subject of the Class.

105.   <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, whether:

    a.  The Class Vehicles were sold with a defect;

    b.  Defendants knew of the defect but failed to disclose the problem and its consequences to their customers;

    c.  A reasonable consumer would consider the defect or its consequences to be material;

    d.  Defendants have failed to provide free repairs as required by their New Vehicle Limited Warranty and/or Powertrain Warranty;

    e.  Defendants should be required to disclose the existence of the defect; and

    f.  Defendants' conduct violates the California Legal Remedies Act, California Unfair Competition Law, and the other statutes asserted herein.

106.   <u>Typicality</u>:  All of Plaintiffs' claims are typical of the claims of the Class because Plaintiffs purchased Class Vehicles with the same engine defect, defective vehicle design, and defective engine, as did each member of the Class. Furthermore, Plaintiffs and all Members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

107.   <u>Adequacy</u>:  Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seek to represent, they have retained

Class Action Complaint
Case No.

counsel who are competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

108.   <u>Superiority</u>:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and Members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for Members of the Class individually to redress effectively the wrongs done to them. Even if the Members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

109.   Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

**VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") (Cal. Civ. Code § 1750, *et seq*.)**

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

110.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

-35-

111.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class. Alternatively, Plaintiff Coats brings this claim on behalf of himself and on behalf of the California Class against Defendants.

112.   Defendants are "persons" as that term is defined in California Civil Code § 1761(c).

113.   Plaintiffs and the Class Members are "consumers" as that term is defined in California Civil Code §1761(d).

114.   Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

> (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

> (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

> (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

> (a)(9) Advertising goods and services with the intent not to sell them as advertised.

115.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

116.   Defendants knew that the Class Vehicles and GDI Engines were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

Class Action Complaint
Case No.

117.   Defendants were under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles and the defective nature of the connecting rod bearings and insufficient engine oil lubrication channels because:

      a.    Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;

      b.    Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had dangerous safety defect until manifestation of the defect;

      c.    Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs that it causes until the manifestation of the defect; and

      d.    Defendants actively concealed the safety and security defect and the associated repair costs by asserting to Plaintiffs and Class Members that the cause of their engine problems was the result of Plaintiffs' and the Class Members' inability to maintain the proper engine oil levels despite knowing the repairs needed to correct the defect.

118.   In failing to disclose the engine defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty to disclose.

119.   The facts concealed or not disclosed by Defendants to Plaintiffs and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price.  Had Plaintiffs and the Class known about the defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles or would have paid less for them.

Class Action Complaint
Case No.

120.   Plaintiff Coats provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a) on December 14, 2017, and seeks injunctive relief. After the 30-day notice period expires, Plaintiff will amend this complaint to seek monetary damages under the CLRA.

121.   Plaintiffs and the other Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

122.   Therefore, Plaintiffs and the other Class Members seek injunctive under the CLRA.

**SECOND CAUSE OF ACTION**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof. Code § 17200)**

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

123.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

124.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class. Alternatively, Plaintiff Coats brings this claim on behalf of himself and on behalf of the California Class against Defendants.

125.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

126.   Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). Defendants should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

127.   The defective connecting rod bearings and insufficient engine oil lubrication channels constitute a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

128.   These acts and practices have deceived Plaintiffs and are likely to deceive the public.  In failing to disclose the defect and suppressing other material facts from Plaintiffs and the Class Members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and the Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

129.   The injuries suffered by Plaintiffs and the Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class Members should have reasonably avoided.

130.   Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

131.   Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

**THIRD CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**

**(Cal. Bus. & Prof. Code § 17500, *et seq*.)**

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

132.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

133.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class. Alternatively, Plaintiff Coats brings this claim on behalf of himself and on behalf of the California Class against Defendants.

134.   California Business & Professions Code § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

135.   Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the other Class Members.

136.   Defendants have violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

137.   Plaintiffs and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles. Defendants' representations were untrue because the Class Vehicles are distributed with defective connecting rod bearings and insufficient engine oil lubrication channels. Had Plaintiffs and the other Class Members known this, they would not have purchased or leased their Class Vehicles or would not have paid as much for them. Accordingly, Plaintiffs and the

Class Action Complaint
Case No.

other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

138.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

139.   Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## FOURTH CAUSE OF ACTION
## VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
### (On Behalf of the Ohio Class)

140.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

141.   Plaintiff Kinnick brings this claim on behalf of himself and on behalf of the Ohio Class against Defendants.

142.   Plaintiff and the other Ohio Subclass members are "consumers" as defined by the Ohio Consumer Sales Practices Act, OHIO REV. CODE § 1345.01 ("OCSPA"). Defendants are "suppliers" as defined by the OCSPA. Plaintiffs' and the other Ohio Subclass members' purchases or leases of the Class Vehicles were "consumer transactions" as defined by the OCSPA.

143.   By willfully failing to disclose and actively concealing the defective transmission, Defendants engaged in deceptive business practices prohibited by the OCSPA, including (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the Class Vehicles

-41-

are of a particular standard, quality, and grade when they are not, (3) advertising the Class Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

144.   In the course of its business, Defendants willfully failed to disclose and actively concealed the defect discussed herein, and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

145.   Defendants knew they had installed defective engines and knew that the Class Vehicles did not operate safely, as advertised. Defendants knew this for years, but concealed all of that information from the public.

146.   Defendants also valued profits over safety, and knew that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. Defendants concealed this information as well.

147.   By failing to disclose that the Class Vehicles did not operate safely because of the defect, by marketing their vehicles as safe, reliable, and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind their vehicles after they were sold, Defendants engaged in deceptive business practices in violation of the OCSPA.

148.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicle with the defect, the quality of the Hyundai brand, the devaluing of safety and performance at Hyundai, and the true value of the Class Vehicles.

Class Action Complaint
Case No.

149.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Ohio class.

150.   Defendants knew or should have known that their conduct violated the OCSPA.

151.   Defendants owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at Hyundai, because Hyundai:

a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective engines in particular, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.

152.   Because Defendants fraudulently concealed the defect and the true performance of the Class Vehicles, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

153.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Defendants in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA.

154.   These cases include, but are not limited to, the following:

-43-

Class Action Complaint
Case No.

a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b.   *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.* (OPIF #10002123);

c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc*. (OPIF #10002347);

g.   *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc*. (OPIF #10001586);

h.   *State ex rel. William J. Brown v. Harold Lyons, et al*. (OPIF #10000304);

i.   *Brinkman v. Mazda Motor of America, Inc*. (OPIF #10001427);

j.   *Khouri v. Don Lewis* (OPIF #100001995);

k.   *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

l.   *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

m.   *Brown v. Spears* (OPIF #10000403).

155.   As a result of its violations of the OCSPA, as detailed above, Defendants caused actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff. Plaintiff and the Class currently own or lease, or within the class period have owned or leased, a Class Vehicle that is defective, which has caused the value of the Class Vehicles to decrease.

Class Action Complaint
Case No.

156.   Plaintiff and the Class sustained damages as a result of Defendants' unlawful acts and are therefore entitled to damages and other relief as provided under the OCSPA.

157.   Because Defendants fraudulently concealed the defect and the true performance of cars equipped with the defective engines, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

158.   Plaintiffs also seek court costs and attorneys' fees as a result of Hyundai's violations of the OCSPA, as provided in Ohio Rev. Code § 1345.09.

## FIFTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

**(On Behalf of the Nationwide Class or, Alternatively, the California Class and Ohio Class)**

159.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

160.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class or, alternatively, on behalf of each of the state subclasses.

161.   Defendants provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain. Accordingly, Defendants' warranties are express warranties under state law.

162.   The parts affected by the defect, including the rotating assembly and engine block, were distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided to all purchasers and lessors of Class Vehicles.

163.   Defendants breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

Class Action Complaint
Case No.

164.   Plaintiffs notified Defendants of the breach within a reasonable time, and/or were not required to do so because affording Defendants a reasonable opportunity to cure their breaches of written warranty would have been futile. Defendants also knew of the defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

165.   As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the defective connecting rod bearings and insufficient engine oil lubrication channels.

166.   Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

167.   The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and the Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

168.   Plaintiffs and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

Class Action Complaint
Case No.

1
2
3
4

## SIXTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY

**(On Behalf of the Nationwide Class or, Alternatively, the California Class and Ohio Class)**

5
6
169.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

7
8
170.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class or, alternatively, on behalf of each of the state subclasses.

9
10
11
171.   Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

12
13
14
15
16
17
18
19
20
172.   Defendants provided Plaintiffs and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles and their engines suffered from defective connecting rod bearings and insufficient engine oil lubrication channels at the time of sale that causes the vehicles to experience premature and catastrophic engine failure. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

21
22
23
24
25
26
27
173.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

28

-47-

Class Action Complaint
Case No.

174.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the other Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

175.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## SEVENTH CAUSE OF ACTION

## BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*)

**(On behalf of the Nationwide Class or, Alternatively, the California Class, and Ohio Class)**

176.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

177.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class or, alternatively, on behalf of the state subclasses.

178.    Plaintiffs and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

179.    Defendants are suppliers and warrantors within the meaning of 15 U.S.C. §§ 2301(4)-(5).

180.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

181.    Defendants' 5 year/60,000 miles Basic Warranty and 10 year/100,000 miles Powertrain Warranty are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

182.    Defendants breached the express warranties by:

    a.      Providing a 5 year/60,000 miles Basic Warranty and a 10 year/100,000 miles Powertrain Warranty with the purchase or

-48-

lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

b.    Selling and leasing Class Vehicles with engines that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c.    Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, the engine or any of its component parts in order to remedy the defective connecting rod bearings and insufficient engine oil lubrication channels.

183.   Plaintiffs and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

184.   Defendants' breach of the express warranties has deprived Plaintiffs and the other Class Members of the benefit of their bargain.

185.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

186.   Defendants have been afforded a reasonable opportunity to cure their breach of the written warranties and/or Plaintiffs and the other Class Members were not required to do so because affording Defendants a reasonable opportunity to cure their breach of written warranties would have been futile. Defendants were also on notice of the alleged defect from the complaints and service requests it received from Class Members, as well as from their own warranty claims, customer complaint data, and/or parts sales data.

187.   As a direct and proximate cause of Defendants' breach of the written warranties, Plaintiffs and the other Class Members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and the other Class Members, who are entitled to recover actual damages, consequential

Class Action Complaint
Case No.

damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

//

//

//

//

## EIGHTH CAUSE OF ACTION

### COMMON LAW FRAUD

### (On Behalf of the Nationwide Class or, Alternatively, the California Class and Ohio Class)

188.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

189.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class or, alternatively, on behalf of the state subclasses.

190.   Defendants made material omissions concerning a presently existing or past fact. For example, Defendants did not fully and truthfully disclose to their customers the true nature of the inherent defect with the GDI Engine, which was not readily discoverable until years later, often after the New Vehicle Limited Warranty or the Powertrain Warranty had expired. As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said defect and all of the resultant problems.

191.   These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiffs and the Class Members rely on them.

192.   Plaintiffs and the Class Members reasonably relied on these omissions, and suffered damages as a result.

1

## NINTH CAUSE OF ACTION

2

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

3

## (On Behalf of the Nationwide Class or, Alternatively, the California Class and Ohio

4

## Class)

5       193.   Plaintiffs and the Class incorporate by reference each preceding and

6    succeeding paragraph as though fully set forth at length herein.

7       194.   Plaintiffs bring this claim on behalf of themselves and on behalf of the

8    Nationwide Class or, alternatively, on behalf of the state subclasses.

9       195.   All contracts in California and Ohio contain an implied covenant of good

10   faith and fair dealing. The implied covenant of good faith and fair dealing is an

11   independent duty and may be breached even if there is no breach of a contract's express

12   terms.

13      196.   Defendants breached the covenant of good faith and fair dealing by, *inter*

14   *alia*, failing to notify Plaintiffs and Class Members of the defective connecting rod

15   bearings and insufficient engine oil lubrication channels in the Class Vehicles, and failing

16   to fully and properly repair this defect.

17      197.   Defendants acted in bad faith and/or with a malicious motive to deny

18   Plaintiffs and the Class Members some benefit of the bargain originally intended by the

19   parties, thereby causing them injuries in an amount to be determined at trial.

20

## TENTH CAUSE OF ACTION

21

## VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF IMPLIED

22

## WARRANTY

23

## (Cal. Civ. Code §§ 1792, 1791.1, *et seq.*)

24

## (On Behalf of the Nationwide Class or, Alternatively, the California Class -)

25      198.   Plaintiffs and the Class incorporate by reference each preceding and

26   succeeding paragraph as though fully set forth at length herein.

27      199.   Plaintiffs bring this claim on behalf of themselves and on behalf of the

28   Nationwide Class or, alternatively, on behalf of the  California Class.

-51-

Class Action Complaint
Case No.

200.   At all relevant times hereto, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or should have known of the specific use for which the Class Vehicles were purchased.

201.   Defendants provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles and their engines suffered from an inherent defect at the time of sale that causes the Class Vehicles to experience premature and catastrophic engine failure.

202.   The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the defect.

203.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

204.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose.  Instead, the Class Vehicles are defective, including, but not limited to, the engine defect and/or manufacture of the GDI Engines.

205.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully request that this Court:

-52-

Class Action Complaint
Case No.

A. determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B. appoint Plaintiffs as the representatives of the Classes and their counsel as Class counsel;

C. award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class Members are entitled under Causes of Action 2 through 10, but award only restitution and injunctive relieve, pursuant to California Civil Code § 1780, at this time;

D. award pre-judgment and post-judgment interest on such monetary relief;

E. grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the engine defect;

F. award reasonable attorneys' fees and costs; and

G. grant such further relief that this Court deems appropriate.

Dated:  December 19, 2017                        Respectfully submitted,

McCune Wright Arevalo LLP


By:   /s/ David C. Wright
       David C. Wright
       Attorneys for Plaintiffs and Putative Class


**JURY DEMAND**

1         Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on
2    all issues so triable.

3                                               McCune Wright Arevalo LLP

4
5                                    By:   */s/ David C. Wright*
6                                               David C. Wright
                                           Attorneys for Plaintiffs and Putative Class

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Class Action Complaint
Case No.